UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

THEODORE D. HARRIS,

       Plaintiff,                              Case No. 12-10387
                                                     Honorable Thomas L. Ludington

v.

COMMISSIONER OF SOCIAL
SECURITY,

       Defendant.
_____/

**OPINION AND ORDER OVERRULING OBJECTIONS, ADOPTING MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION, AND REMANDING CASE**

This case involves a Social Security Disability (SSD) proceeding under the single decision-maker (SDM) model for adjudicating claims. In such circumstances, must an Administrative Law Judge (ALJ) consult with a medical expert before making medical-equivalency determinations? Answering in the affirmative, this case will be remanded so the ALJ can do just that.

**I**

**A**

Plaintiff Theodore Harris was born December 14, 1962. Since that time, he has experienced a series of health problems. He has diabetes, chronic back and shoulder pain, and has suffered multiple heart attacks.

Plaintiff's primary-care physician is Marybeth Knight, D.O. In order to keep up with Plaintiff's ailments, Dr. Knight frequently refers him to specialists. On February 18, 2003, at the recommendation of Dr. Knight, Plaintiff saw Robert P. Pierce, D.O. for a neurologic assessment regarding low back pain. Admin. R. 152, ECF No. 8. Ultimately, Dr. Pierce diagnosed Plaintiff

with left L5-S1 disc herniation and "chronic back pain secondary to previous disc herniations as well as musculoskeletal etiology including degenerative joint disease and possible sacroiliac joint dysfunction." *Id*. at 153. Dr. Pierce recommended a course of steroid injections and physical therapy to help with pain management. *Id*.

In August 2009, Dr. Knight referred Plaintiff to see Homer C. Linard III, M.D. for an orthopedic consultation to address left-shoulder pain. *Id*. at 156. X-rays exhibited "some AC arthritis and a type II acromion" while an MRI showed "some tendinosis in the rotator cuff" and "a possible labral tear." *Id*. Dr. Linard concluded that Plaintiff was suffering from impingement syndrome in his left shoulder, injected Plaintiff with Depo-Medrol and Marcaine, and recommended a short course of physical therapy. *Id*. at 157. Plaintiff returned to Dr. Linard for a second evaluation on October 2, 2009. While there was some improvement, Plaintiff's condition worsened when trying to raise his arms above his head. *Id*. at 155. Dr. Linard recommended Plaintiff consider arthroscopic surgery with subacromial decompression and possible SLAP repair.[1] *Id.*

Plaintiff also has been a type 1 diabetic since approximately 1990. In September 2009, Dr. Knight referred him to Mark Marrone, M.D. for a consultation regarding his diabetes-related kidney disease and proteinuria.[2] *Id*. at 160. After examining Plaintiff, Dr. Marrone diagnosed stage 2 chronic kidney disease. *Id*. at 161. Dr. Marrone recommended further testing, and that Plaintiff continue his medicinal regimen, lose weight, and stop smoking. *Id*. Plaintiff returned to see Dr. Marrone on May 19, 2010 to follow up regarding his chronic kidney disease. *Id*. at 246. During the evaluation, Dr. Marrone determined that Plaintiff was suffering from "nonoliguric

---

[1] SLAP refers to "superior labral tear from anterior to posterior." *See* SLAP tear, http://en.wikipedia.org/wiki/SLAP_tear (last visited Mar. 21, 2013).

[2] The presence of an excess of serum proteins in the urine. *See* Proteinuria, http://en.wikipedia.org/wiki/Proteinuria (last visited Mar. 21, 2013).

acute kidney injury secondary to decreased effective circulating volume secondary to compromised cardiac output . . . ." *Id*.

Over recent years, Plaintiff has had unscheduled appointments as well. On October 12, 2009, he was admitted to Botsford Hospital complaining of mild chest pain, which radiated into his abdomen, along with shortness of breath, diaphoresis, nausea, and vomiting. *Id*. at 168. Matthew Warpinski, D.O. diagnosed a nontransmural myocardial infarction (heart attack). *Id*. at 175. Dr. Warpinski wrote, "Imminent danger of deterioration likely without documented intervention." *Id*.

Due to Plaintiff's history of heart disease,[3] Mark Sierra, M.D. was called in for a consultation on October 13, 2009. Dr. Sierra agreed that Plaintiff had experienced a myocardial infarction and recommended that a cardiac catheterization be performed on October 14 to remedy the problem. *Id*. at 190. The catheterization revealed "[m]ultivessel coronary artery disease involving the small diagonal branches and a very small, atretic right coronary artery" and "nonobstructive disease involving the left anterior descending and circumflex arteries." *Id*. at 194. Plaintiff was discharged the day after the procedure — October 15, 2009. *Id*. at 265.

On March 8, 2010, Plaintiff was again admitted to Botsford Hospital complaining of chest pain, nausea, and vomiting. *Id*. at 263. His attending physician, Colleen Hartwig, D.O., suspected that it was likely another small vessel event, similar to October 2009. *Id*. After a short recovery, Plaintiff was discharged on March 11, 2010. *Id*. But not for long. Plaintiff found himself in Botsford Hospital yet again on June 20, 2010 complaining of chest pain and shortness of breath. *Id*. at 261. His primary care physician, Dr. Knight, was his attending physician for the visit. After Plaintiff was stabilized, Dr. Knight diagnosed acute exacerbation of chronic

---

[3] Plaintiff testified this was not his first heart attack; that he suffered one earlier, possibly in October 2008. Admin. R. 41.

obstructive pulmonary disease (COPD), coronary artery disease, diabetic gastroparesis,[4] cardiomyopathy,[5] chronic low back pain, hypertension, chronic kidney disease, and anemia of chronic disease and leukocytosis.[6] *Id*. After a four-day stay, Plaintiff was released.

Plaintiff saw other doctors as he struggled with his health during this time. Majid Qazi, D.O. examined plaintiff on December 9, 2009 after the October 2009 heart attack. Dr. Qazi reported that Plaintiff had demonstrated small vessel ischemia[7] and chronic total occlusion of a small RCA vessel. *Id*. at 267. Plaintiff was referred to Steven Seidman, D.O. for an MRI of his lumbar spine, which was performed on October 6, 2010. Dr. Seidman noted "[p]rominent degenerative changes involv[ing] L4-L5, L5-S1 and to a lesser extent L3-L4 discs and facets. Relatively large central disc herniation is present at L4-L5. Moderately advanced central spinal stenosis does result at this level." *Id*. at 287. Dr. Seidman did observe, however, that the findings had "not changed significantly" when "compared to the previous study of July 27, 2002." *Id*.

**B**

Not surprisingly, as these ailments took their toll, Plaintiff's ability to work diminished. From 1997 until August 2006, he was an automobile technician. *Id*. at 38. In August 2006, Plaintiff quit working in order to attend college full time. *Id*. at 38–39. But in October 2009 — wracked by back and shoulder pain, complications from diabetes, and heart attacks — Plaintiff

---

[4] A medical condition consisting of partial paralysis of the stomach, resulting in food remaining in the stomach for a longer period than normal. *See* Gastroparesis, http://en.wikipedia.org/wiki/Gastroparesis (last visited Mar. 21, 2013).

[5] The measurable deterioration of the function of the heart muscle for any reason, usually leading to heart failure. *See* Cardiomyopathy, http://en.wikipedia.org/wiki/Cardiomyopathy (last visited Mar. 21, 2013).

[6] White blood cell count above the normal range. *See* Leukocytosis, http://en.wikipedia.org/wiki/Leukocytosis (last visited Mar. 21, 2013).

[7] A restriction in blood supply to tissues, causing a shortage of oxygen and glucose needed for cellular metabolism. *See* Ischemia, http://en.wikipedia.org/wiki/Ischemia (last visited Mar. 21, 2013).

submitted an application for disability benefits.[8] Filed on October 22, 2009, Plaintiff claimed his condition began interfering with his ability to work in the spring of 2009, and that he "became unable to work because of [his] disabling condition on October 16, 2009." *Id*. at 101. Plaintiff indicated he was limited by heart attacks and his back injury, and that he was prone to seizures of unknown origin. *Id*. at 126. He wrote, "SOMEDAYS I CAN NOT EVEN STAND UP, WALKING IS A CHORE." *Id.*

Plaintiff's claim for Social Security benefits was denied on January 19, 2010, *id*. at 67–70, after which he filed a written request for a hearing on March 2, 2010 (pursuant to 20 C.F.R. § 404.929), *id*. at 73. The hearing took place on December 15, 2010, before ALJ Anthony R. Smereka.

There were three noteworthy occurrences between the filing of Plaintiff's benefits application and the December 2010 hearing. First, on December 15, 2009, Plaintiff underwent a medical consultation at the behest of the Social Security Administration (SSA). He was examined by Abigail Lynne Neal, M.D. Dr. Neal concluded that Plaintiff had coronary artery disease (noting his two heart attacks); poorly controlled diabetes with evidence of kidney disease, retinopathy,[9] and possible neuropathy[10]; low back pain with significantly decreased range of motion; and left shoulder pain due to a rotator cuff tear. *Id*. at 206.

Then, on January 16, 2010, Shannon E. Smith completed a physical residual functional capacity (RFC) assessment of Plaintiff. Although Ms. Smith is not a doctor, she indicated Plaintiff could occasionally lift 20 pounds, frequently lift 10 pounds, and stand or walk (with

---

[8] Plaintiff filed a Title II application for a period of disability and disability insurance benefits. Admin. R. 20.

[9] Damage to the retina caused by complications of diabetes, which can eventually lead to blindness. *See* Diabetic retinopathy, http://en.wikipedia.org/wiki/Diabetic_retinopathy (last visited Mar. 21, 2013).

[10] Damage to nerves or peripheral nervous system. *See* Neuropathy, http://en.wikipedia.org/wiki/Neuropathy (last visited Mar. 21, 2013).

normal breaks) for a total of 6 hours in an 8-hour workday. *Id*. at 210. Ms. Smith determined that Plaintiff's left shoulder would limit the use of his upper extremities, and preclude using hand controls with his left arm. *Id*. at 210–11. Along with limited reaching in all directions, and only occasionally climbing, stooping, kneeling, crouching, and crawling, Ms. Smith found no other restrictions on Plaintiff's ability to work. *Id*. at 211–13.

Finally, on December 3, 2010, Dr. Knight created a medical report and assessment based on her time as Plaintiff's doctor. She indicated she had treated Plaintiff from April 2007 through September 2010, and diagnosed "unspecified HTN,[11] gastroparesis, esophageal reflux, renal insufficiency, arteriosclerotic heart disease, hypercholesterolemia,[12] DMI, and shoulder pain. *Id*. at 218. She described Plaintiff's pain as severe, and his weakness and fatigue as severe. *Id*. at 219. Dr. Knight concluded that Plaintiff could not perform sedentary work on a sustained basis, nor any other type of work, and that his impairments would be "lifelong." *Id*. at 220–21.

During the December 15 hearing before ALJ Smereka, Plaintiff testified that he cannot mow his lawn, walk around the block, or even take out the garbage without experiencing chest pains. *Id*. at 42–43. Plaintiff discussed his back problems and treatment with Dr. Knight. *Id*. at 46–47. He testified that his back pain, even while on medication, is consistently 8 out of 10. *Id*. at 47. He also claimed that he can only sit for "[f]ifteen minutes" before he has to get up, and spends "probably about six hours" laying down during the waking day. *Id*. at 47–48. Plaintiff touched on his other physical ailments as well: the diabetes and kidney problems, his high blood pressure and heart failure, and the shoulder pain with "possible rotator cuff tear." *Id*. at 48–50.

---

[11] Hypertension.
[12] Presence of high levels of cholesterol in the blood. *See* Hypercholesterolemia, http://en.wikipedia.org/wiki/Hypercholesterolemia (last visited Mar. 21, 2013).

The ALJ then questioned Jennifer Turecki, an independent vocational expert. *Id*. at 57–58. She testified that, with certain restrictions,[13] Plaintiff could perform jobs at the light, unskilled level and below, but could not return to his past work as an automotive technician. *Id*. at 60.

Following the hearing, ALJ Smereka issued a decision on March 11, 2011, concluding that Plaintiff "was not under a disability within the meaning of the Social Security Act from October 16, 2009 through the date last insured." *Id*. at 20. ALJ Smereka concluded that while Plaintiff was not employed, and suffered from multiple severe impairments, those impairments did not meet or equal any of the SSA's listed impairments. *See* 20 C.F.R. § 404.1520(a)(4)(iii). Despite limitations, ALJ Smereka determined that Plaintiff could still perform some jobs. Admin. R. 27–28.

On April 1, 2011, Plaintiff appealed the decision by requesting a review by the Appeals Council. After examination and consideration of additional exhibits, in a notice dated December 13, 2011, the SSA Appeals Council denied Plaintiff's request for review of the ALJ's decision, and the ALJ's decision became final. *Id*. at 1–3. Plaintiff then filed this lawsuit.

On May 19, 2012, Plaintiff filed a motion for summary judgment, requesting that the ALJ's decision be reversed. On August 17, 2012, Defendant Commissioner of Social Security filed a motion for summary judgment of its own, arguing that the ALJ's decision should be affirmed. Both motions were referred to Magistrate Judge Michael Hluchaniuk for review. On February 28, 2013, Magistrate Judge Hluchaniuk issued a report recommending that Plaintiff's motion be granted in part, that Defendant's motion be denied, and that the ALJ's decision be reversed and the case remanded for further proceedings. Specifically, the Magistrate Judge

---

[13] The ALJ provided the following restrictions as a hypothetical: no climbing ladders, ropes, or scaffolds; no crawling; no work at unprotected heights; a relatively clean air environment; no raising the left, non-dominant upper extremity over the shoulder; and a sit/stand option. Admin. R. 60.

Hluchaniuk found "the lack of an expert medical opinion on the issue of equivalency is problematic and violated the requirements of SSR 96-6p." Report & Recommendation 21, ECF No. 20. Defendant filed objections to the magistrate judge's report and recommendation, arguing that the ALJ was not required to seek a medical opinion on the issue of equivalency, and that substantial evidence supports the conclusion that Plaintiff can perform light, unskilled work. Def.'s Obj. 1–2, ECF No. 21.

## II

The Social Security Act (the Act) "entitles benefits to certain claimants who, by virtue of a medically determinable physical or mental impairment of at least a year's expected duration, cannot engage in 'substantial gainful activity.'" *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 642 (6th Cir. 2006) (en banc) (quoting 42 U.S.C. § 423(d)(1)(A)). A claimant qualifies as disabled "if she cannot, in light of her age, education, and work experience, 'engage in any other kind of substantial gainful work which exists in the national economy.'" *Combs*, 459 F.3d at 642 (quoting 42 U.S.C. § 423(d)(2)(A)).

Under the authority of the Act, the SSA has established a five-step sequential evaluation process for determining whether an individual is disabled. *See* 20 C.F.R. § 404.1520(a)(4). The five steps are as follows:

> In step one, the SSA identifies claimants who "are doing substantial gainful activity" and concludes that these claimants are not disabled. [20 C.F.R.] § 404.1520(a)(4)(i). If claimants get past this step, the SSA at step two considers the "medical severity" of claimants' impairments, particularly whether such impairments have lasted or will last for at least twelve months. *Id.* § 404.1520(a)(4)(ii). Claimants with impairments of insufficient duration are not disabled. *See id.* Those with impairments that have lasted or will last at least twelve months proceed to step three.
>
> At step three, the SSA examines the severity of claimants' impairments but with a view not solely to their duration but also to the degree of affliction imposed. *Id.* § 404.1520(a)(4)(iii). Claimants are conclusively presumed to be disabled if they suffer from an infirmity that appears on the SSA's special list of impairments, or

> that is at least equal in severity to those listed. *Id.* § 404.1520(a)(4)(iii), (d). The list identifies and defines impairments that are of sufficient severity as to prevent any gainful activity. *See Sullivan v. Zebley*, 493 U.S. 521, 532 (1990). A person with such an impairment or an equivalent, consequently, necessarily satisfies the statutory definition of disability. For such claimants, the process ends at step three. Claimants with lesser impairments proceed to step four.
>
> In the fourth step, the SSA evaluates claimants' "residual functional capacity," defined as "the most [the claimant] can still do despite [her] limitations." 20 C.F.R. § 404.1545(a)(1). Claimants whose residual functional capacity permits them to perform their "past relevant work" are not disabled. *Id.* § 404.1520(a)(4)(iv), (f). "Past relevant work" is defined as work claimants have done within the past fifteen years that is "substantial gainful activity" and that lasted long enough for the claimant to learn to do it. *Id.* § 404.1560(b)(1). Claimants who can still do their past relevant work are not disabled. Those who cannot do their past relevant work proceed to the fifth step, in which the SSA determines whether claimants, in light of their residual functional capacity, age, education, and work experience, can perform "substantial gainful activity" other than their past relevant work. *See id.* § 404.1520(a)(4)(v), (g)(1). Claimants who can perform such work are not disabled. *See id.*; § 404.1560(c)(1).

*Combs*, 459 F.3d at 642–43.

"Through step four, the claimant bears the burden of proving the existence and severity of limitations caused by her impairments and the fact that she is precluded from performing her past relevant work." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 474 (6th Cir. 2003). If the analysis reaches the fifth step, the burden transfers to the Commissioner. *Combs*, 459 F.3d at 643. At that point, the Commissioner is required to show that "other jobs in significant numbers exist in the national economy that [claimant] could perform given [his] RFC and considering relevant vocational factors." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007); 20 C.F.R. §§ 416.920(a)(4)(v) and (g).

The Act authorizes judicial review of the Commissioner's final decision pursuant to 42 U.S.C. § 405(g). Where, as here, the Appeals Council denies review, the ALJ's decision stands as the Commissioner's final decision. 20 C.F.R. § 404.981. Judicial review is limited in that the court "must affirm the Commissioner's conclusions absent a determination that the

Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record." *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005). Substantial evidence is "such relevant evidence as a reasonable mind might accept to support the ALJ's conclusion." *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007) (quotation marks omitted) (quoting *Foster v. Halter*, 279 F.3d 348, 353 (6th Cir. 2001)). This substantial evidence standard is less exacting than the preponderance of evidence standard. *Bass*, 499 F.3d at 509 (citing *Bell v. Comm'r of Soc. Sec.*, 105 F.3d 244, 246 (6th Cir. 1996)). For example, if the ALJ's decision is supported by substantial evidence, "then reversal would not be warranted even if substantial evidence would support the opposite conclusion." *Bass*, 499 F.3d at 509 (citing *Longworth*, 402 F.3d at 595).

### III

Plaintiff requests that this Court remand the case to the ALJ under either of the following scenarios: (1) remand with instructions to award benefits because the medical evidence supports Dr. Knight's finding that Plaintiff is disabled and cannot work; or (2) remand with instructions to obtain expert testimony regarding whether Plaintiff's impairments equal a listing on the SSA's list of impairments. Noted above, Magistrate Judge Hluchaniuk agreed with the latter proposition. The magistrate judge recommended the case be remanded "so that the ALJ can obtain the opinion of a qualified medical advisor on the issue of equivalence." *Id*. at 26. This Court agrees.

Defendant objects to the magistrate judge's conclusion that an expert opinion is required at step three to determine whether Plaintiff's impairments meet or equal a listed impairment. Defendant argues such a requirement is inconsistent with the SDM model. But Magistrate Judge Hluchaniuk did not arrive at his conclusions without authority. He cited to multiple cases for the

proposition that a medical opinion is necessary for equivalency determinations. *Stratton v. Astrue*, ––– F.Supp.2d ––––, 2012 WL 1852084 (D.N.H.2012); *Barnett v. Barnhart*, 381 F.3d 664, 670 (7th Cir. 2004); *Retka v. Comm'r of Soc. Sec.*, No. 93–40494, 1995 WL 697215 (6th Cir. Nov. 22, 1995); *Modjewski v. Astrue*, No. 11–C–8, 2011 WL 4841091 (E.D. Wis. Oct. 12, 2011).

In *Stratton*, the court recognized that Social Security Ruling (SSR) 96–6p provides, "longstanding policy requires that the judgment of a physician . . . designated by the Commissioner on the issue of equivalence on the evidence before the administrative law judge . . . must be received into the record as expert opinion evidence and given appropriate weight." 2012 WL 1852084, at *11 (emphasis deleted) (quoting Social Security Ruling 96–6p, 1996 WL 374180, at *3 (S.S.A. July 2, 1996)). The *Stratton* court further explained that SSR 96–6p treats equivalency determinations differently from determinations as to whether an impairment meets a listing, requiring expert evidence for the former but not the latter. *Stratton*, 2012 WL 1852084, at *12; *see also Galloway v. Astrue*, No. 07-01646, 2008 WL 8053508, at *5 (S.D. Tex. May 23, 2008) ("The basic principle behind SSR 96–6p is that while an ALJ is capable of reviewing records to determine whether a claimant's ailments *meet* the Listings, expert assistance is crucial to an ALJ's determination of whether a claimant's ailments are *equivalent* to the Listings.") (emphasis in original).

This is consistent with the applicable federal regulations. 20 C.F.R. § 404.1526(c), entitled "What evidence do we consider when we determine if your impairment(s) medically equals a listing?" provides that when Defendant (or, as here, the ALJ) assesses whether an impairment equals a listing, a necessary consideration is "the opinion given by one or more medical or psychological consultants designated by the Commissioner." *Id*.

In support of the opposite conclusion, Defendant relies on *Gallagher v. Comm'r of Soc. Sec.*, No. 10–cv–12498, 2011 WL 3841632 (E.D. Mich. Mar. 29, 2011); *Timm v. Comm'r of Soc. Sec.*, No. 10–cv–10594, 2011 WL 846059 (E.D.Mich. Feb.14, 2011); and *Oakes v. Barnhart*, 400 F. Supp. 2d 766, 777 (E.D. Pa. 2005). Those cases held that an ALJ was not required to obtain medical evidence on the issue of equivalency in cases using the SDM model. None of the three cases, however, are particularly persuasive.

*Timm* and *Gallagher* do not address: (1) the fact that SDM opinion evidence is not considered an acceptable medical source; and (2) the memorandum issued by Acting Chief Administrative Law Judge on September 14, 2010 (10–1691), which established the following for SDM cases:

> Agency policy is that findings made by SDMs are *not* opinion evidence that Administrative Law Judges (ALJs) or Attorney Adjudicator (AAs) should consider and address in their decisions. See, for example, POMS DI 24510.050C, which states that SDM-completed forms are not opinion evidence at the appeal levels. SDM findings are not "medical opinion" evidence since they do not come from medical sources. However, agency policy is that they are also not the opinions of non-medical sources as described in SSR 06–3p.
>
> Therefore, ALJs and AAs must not consider SDM RFC assessment forms and other findings as opinion evidence and must not evaluate them in their decisions. ALJs and, by extension, AAs *must continue to consider findings made by State agency MCs and PCs as opinion evidence and weigh that evidence together with the other evidence in the record when they make their decisions*. 20 CFR 404.1527(f) and 416.927(f) and Social Security Ruling 96–6p.

(first emphasis in original, additional emphasis added).

Although Defendant is correct that the SDM model was tested in Michigan as a way to streamline cases, it is incorrect to assert that SSR 96–6p is abrogated by the SDM model. The model involves "having a single decisionmaker make the *initial determination* [of disability] with assistance from medical consultants, where appropriate . . . ." 20 C.F.R. § 404.906(a)

(emphasis added). The initial determination comes before a claimant requests a hearing with an ALJ. Recognized by other courts in this district:

> The "single decisionmaker model" was an experimental modification of the disability determination process that happens to have been used in Michigan. This experiment eliminated the reconsideration level of review and allowed claims to go straight from *initial denial* to ALJ hearing. Most significantly, it allowed the state agency employee (the single decisionmaker) to render the *initial denial of benefits* without documenting medical opinions from the state agency medical consultants.

*Leverette v. Comm'r of Soc. Sec.*, No. 10–10795, 2011 WL 4062380, at *2 (E.D. Mich. Aug. 17, 2011) (emphasis added) (citing 20 C.F.R. §§ 404.906(b)(2), 416.1406(b)(2)); *see also Maynard v. Astrue*, No. 11-12221, 2012 WL 5471150, at *6 (E.D. Mich. Nov. 9, 2012). However, once a hearing is requested and the process advances from the initial determination, SSR 96–6p applies with full force. *Id*. Thus, a medical opinion on the issue of equivalence is required, regardless of whether the SDM model is implicated. *Id*. Defendant's attempt to expand the purposes of the SDM model beyond the initial determination of disability and through proceedings before the ALJ is unpersuasive.

It is true there is case authority landing on both sides of the question, but the great weight of authority holds that a record lacking any medical expert opinion on equivalency requires a remand.[14] While there is support for the proposition that such an error can be harmless, and

---

[14] *Barnett v. Barnhart*, 381 F.3d 664, 670 (7th Cir. 2004) ("Whether a claimant's impairment equals a listing is a medical judgment, and an ALJ must consider an expert's opinion on the issue."); *Retka v. Comm'r of Soc. Sec.*, No. 94-2013, 1995 WL 697215, at *2 (6th Cir. 1995) ("Generally, the opinion of a medical expert is required before a determination of medical equivalence is made."); *Stratton*, 2012 WL 1852084, at *14 ("All other things being equal, the court would have no difficulty concluding that this case should be remanded due to the lack of expert-opinion evidence on the question of equivalence."); *Caine v. Astrue*, No. 09-450, 2010 WL 2102826 (W.D. Wash. Apr. 14, 2010) *report and recommendation adopted*, No. 09-0450, 2010 WL 2103637, at *8 (W.D. Wash. May 25, 2010) ("SSR 96–6p requires the ALJ to obtain an updated medical expert opinion if . . . additional medical evidence may change the state agency consultant's finding on equivalence. That is clearly the situation in this case, where the state agency consultant had no finding on equivalence."); *Wadsworth v. Astrue*, No. 07-0832, 2008 WL 2857326, at *7 (S.D. Ind. July 21, 2008) ("the ALJ erred in not seeking the opinion of a medical advisor as to whether [claimant's] impairments equaled a listing."); *Berrios-Vasquez v. Massanari*, CIV. A. 00-CV-2713, 2001

while this Court is not necessarily convinced that Plaintiff can show his physical impairments satisfy the equivalency requirements, "[n]either the ALJ nor this court possesses the requisite medical expertise to determine if [Plaintiff's] impairments . . . in combination equal one of the Commissioner's listings." *Freeman v. Astrue*, No. 10-0328, 2012 WL 384838, at *4 (E.D. Wash. Feb. 6, 2012). Additionally, by the same logic, the Court will not yet tangle with Plaintiff's contention that substantial evidence supports a finding he is disabled. Thus, the case will be remanded so that the ALJ can properly make an equivalency determination after consulting with a Commissioner-appointed medical expert.

## IV

Accordingly, it is **ORDERED** that Defendant's objections to the magistrate judge's report and recommendation, ECF No. 21, are **OVERRULED**.

It is further **ORDERED** that the magistrate judge's report and recommendation, ECF No. 20, is **ADOPTED**.

It is further **ORDERED** that Plaintiff's motion for summary judgment, ECF No. 12, is **GRANTED** in part and **DENIED** in part.

It is further **ORDERED** that Defendant's motion for summary judgment, ECF No. 16, is **DENIED**.

---

WL 868666, at *8 (E.D. Pa. May 10, 2001) ("the ALJ's analysis of the evidence was insufficient because he failed to obtain an evaluation of equivalence by a medical expert designated by the Commissioner."). Although not all of these cases are specific to the SDM model for adjudicating SSD benefits claims, they all emphasize the need for an ALJ to consult with a medical expert before making an equivalency determination. As the Court is satisfied the SDM model did not abrogate SSR 96–6p, this point bears such emphasis.

It is further **ORDERED** that the determination of the Commissioner is **REVERSED**, and this case is **REMANDED** for further proceedings consistent with this opinion.

Dated: March 22, 2013                                s/Thomas L. Ludington
                                                     THOMAS L. LUDINGTON
                                                     United States District Judge

---

**PROOF OF SERVICE**

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on March 22, 2013.

                    s/Tracy A. Jacobs
                    TRACY A. JACOBS